| | AUSA: | John Engstrom | Telephone: | (313) 226-9571 |
|---|---|---|---|---|
| AO 106 (Rev. 04/10) Application for a Search Warrant | Special Agent: | Michael Wakeley | Telephone: | (313) 965-6358 |

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| 10365 HAGGERTY, SUITE 113 DEARBORN, MI 48126 | ) ) ) | |

Case: 2:17–mc–50785
Assigned To : Cox, Sean F.
Assign. Date : 6/5/2017
Description: RE: SEALED MATTER
(EOB)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the _____ Eastern _____ District of _____ Michigan _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Illegal Distribution of Controlled Substances; Conspiracy |

The application is based on these facts:

See attached AFFIDAVIT.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

MICHAEL WAKELEY, Special Agent- FBI
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____ June 5, 2017 _____

*Judge's signature*

City and state:  Detroit, Michigan

Hon. David R. Grand,    U. S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

IN THE MATTER OF:                                    :
                                                     :
THE SEARCH OF                                        :
                                                     :
Tete Oniango, M.D. PLLC                              :
10365 Haggerty, Suite 113                            :        Filed Under Seal
Dearborn, Michigan  48126                            :
                                                     :

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

1. I am a special agent with the Federal Bureau of Investigation (FBI), duly
   appointed according to law and acting as such, and have been employed as
   such since August 2016. I am currently assigned to the Detroit division of
   the FBI and my duties include investigating health care fraud and
   prescription drug diversion.

2. I have received general law enforcement training at the FBI Academy, and I
   have been personally involved in investigations concerning health care
   fraud, prescription drug diversion and methods used to finance and conceal
   the profits of those operations. I am familiar with the Medicare program, as
   well as the federal healthcare fraud and narcotics trafficking laws.

3. I am assigned to an investigation pertaining to the diversion of controlled
   substances by Dr. TETE ONIANGO, TETE ONIANGO M.D. PLLC, and
   others not named. The information herein is known to me through personal
   knowledge and investigation and/or from review of documents and
   interviews of people having direct knowledge of these events. This affidavit
   does not include every fact relevant to this investigation that is known to me.

4. This affidavit is respectfully submitted in support of a search warrant for the
   business address of TETE ONIANGO and TETE ONIANGO M.D. PLLC,
   located at 10365 Haggerty, Suite 113, Dearborn, Michigan. This request is
   based on probable cause that from January 1, 2014 to April 30, 2017, Dr.
   ONIANGO, and others not named, conspired to dispense and divert in

1

excess of 1.4 million tablets of controlled substances, specifically: over 939,000 tablets of Schedule II controlled substances; 24,900 tablets of Schedule III controlled substances; and over 464,000 tablets of Schedule IV controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), by knowingly issuing prescriptions for controlled substances without medical necessity and outside the scope of professional practice. The pills Dr. ONIANGO has so prescribed include hydrocodone bitartrate, alprazolam, carisoprodol, and other controlled substances.

5. Based on my experience and training as a special agent, and my experience in investigating similar drug diversions, I am aware of prescribing patterns which are commonly seen by physicians prescribing controlled substances outside the course of legitimate medical practice and pharmacies dispensing these substances outside legitimate pharmacy practice. These patterns include, but are not limited to, multiple patients receiving the same combination of controlled substances; individuals traveling outside of the area in which they live to obtain prescriptions; excessive numbers of identical prescriptions in different names prescribed by the same doctor and filled by the same pharmacy; patients obtaining large quantities of controlled substances over an extended period of time; patients receiving multiple prescriptions simultaneously for different opiate-based narcotics, or other substances with a known street desire; patients receiving prescriptions for the maximum dosage of a narcotic, or other controlled substance, with no titration ("ramp up") or trial period; patients of limited means paying for expensive narcotics with cash; and doctors routinely prescribing the highest available dosage of a controlled substance.

6. 21 U.S.C. § 822(a)(1) requires every person who manufactures or distributes a controlled substance to be registered by the Attorney General of the United States. Such registrations are maintained by the Drug Enforcement Administration (DEA). A registrant's activity with controlled substances is limited to the extent of his/her registration.

7. Title 21, Code of Federal Regulation, Section 1306.04(a) states that in order for a prescription for a controlled substance to be effective it must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of 21 U.S.C. § 829.

8. Hydrocodone bitartrate is an opioid-analgesic and/or antitussive that is commonly known for being combined with acetaminophen (commonly known by the brand name Tylenol®) to form a narcotic pain reliever tablet (commonly known by the brand names Vicodin®, Lortab®, Lorcet®, and Norco®). This combination is properly used to relieve moderate to severe pain. Prior to October 6, 2014, hydrocodone combination products were regulated as a Schedule III controlled substance and are now regulated as a Schedule II controlled substance.

9. Alprazolam (commonly known by the brand name Xanax®) is a benzodiazepine and a Schedule IV controlled substance. Alprazolam is primarily intended to treat anxiety and/or panic disorders. It is often used recreationally, or through addiction, due to its ability to cause the user feelings of relaxation, calm, or overall wellbeing. The most commonly diverted dosage units are the 1mg and 2mg versions which are often referred to as "footballs" and "bars," respectively, due to their physical shapes.

10. Carisoprodol (commonly known by the brand name Soma®) is a Schedule IV controlled substance. Carisoprodol is a muscle relaxant and is commonly prescribed to help the muscles relax and relieve pain due to muscle spasms. Carisoprodol has been found to accelerate the effects of other drugs and is therefore commonly mixed with alprazolam and hydrocodone by drug abusers.

11. Through my investigation of this and other drug diversion conspiracies, I am aware of numerous individuals and organizations of individuals in the greater Detroit, Michigan area diverting hydrocodone bitartrate, alprazolam and carisprodol for illegal sale. I am also aware of the following prices which can be obtained by illegal street sales of the above mentioned narcotics:

   a. Hydrocodone bitartrate/acetaminophen: $5.00 to $6.00 per tablet can be obtained, or have been, obtained for hydrocodone bitartrate/ acetaminophen tablets. Street prices of these tablets vary widely based upon the amount of hydrocodone contained in the tablet. While a 7.5/750mg tablet of Vicodin® will often sell for $5.00 or more, a Lortab® or Norco® tablet containing 10mg of hydrocodone will often sell for $6.00 or more.

3

b. Alprazolam: $2.00 or more per milligram can be, or have been, obtained for alprazolam tablets.

c. Carisoprodol: $2.00 to $3.00 per tablet can often be, or have been, obtained for carisoprodol tablets.

12. I am aware that "patient recruiters" often locate "patients" for the purpose of obtaining medically unnecessary controlled substance prescriptions from a doctor who is willing to so prescribe. These patient recruiters profit from the diversion and sale of narcotics prescribed to their patients by a doctor, or employee of a doctor. The patients are often compensated in cash or narcotics by the patient recruiter.

13. On January 1, 2003, the State of Michigan instituted the Michigan Automated Prescription System (MAPS). MAPS requires all pharmacies in Michigan to report on a monthly basis all controlled substance prescriptions filled at their pharmacy. These reports must be submitted to MAPS by the 15th day of the following month in which the prescription was filled. Controlled substance information reported to MAPS includes, but is not limited to, the following:

a. Patient Data: Name, address, and date of birth

b. Physician Data: Prescriber's name and DEA number

c. Drug: Name of controlled substance, strength, quantity, and prescription number

d. Pharmacy Data: Dispensing Pharmacy, location, and state license number

14. The purpose of MAPS is to help health professionals prevent drug abuse and diversion of controlled substances. MAPS encourages physicians who prescribe controlled substances to register for MAPS and to request a controlled substance prescription history on their patients.

15. In late 2003, members of the Michigan Board of Medicine and Michigan Board of Osteopathic Medicine & Surgery formally adopted the "Michigan Guidelines for the Use of Controlled Substances for the Treatment of Pain" ("Guidelines"). The Guidelines lay out requirements for evaluating patients

before prescribing controlled substances to manage pain:

> A complete medical history and physical examination must be conducted and documented in the medical record. The medical record should document the nature and intensity of the pain, current and past treatments for pain, underlying or coexisting diseases or conditions, the effect of the pain on physical and psychological function, and history of substance abuse. The medical record also should document the presence of one or more recognized medical indications for the use of a controlled substance.

The Guidelines also state that "[a]fter treatment begins, the physician should adjust drug therapy to the individual medical needs of each patient." Periodic reviews are also required under the Guidelines: "At reasonable intervals based on the individual circumstances of the patient, the physician should review the course of treatment and any new information about the etiology of the pain." *See* Michigan Guidelines for the Use of Controlled Substances for the Treatment of Pain.

16. In a February 2011 deposition for an unrelated civil law suit, Dr. ONIANGO was asked about prescribing Vicodin to a patient. Dr. ONIANGO stated:

> If a patient comes complaining of pain, you have to do a full examination . . . you know, part of the history-taking, and then make a determination based on that. But just patient coming in complaining of pain, I would have to set some criteria up for me to decide whether to give him pain medication or not.

### SUMMARY OF INVESTIGATION

17. This investigation was predicated on information from the DEA, Dearborn Police Department, and concerned community members that Dr. ONIANGO was engaged in prescription drug diversion at a clinic located at 10365 Haggerty Road, Suite 113, Dearborn, Michigan.

18. The website of the State of Michigan Department of Licensing and Regulatory Affairs ("LARA") shows that Dr. ONIANGO obtained a license to practice medicine in Michigan on January 7, 2009. Dr. ONIANGO's medical license is currently active and set to expire on January 31, 2019.

19. According to LARA, TETE ONIANGO M.D. PLLC is listed as a professional domestic limited liability company with a registered address of 145 South Livernois, #159, Rochester Hills, Michigan. This address is a UPS Store location.

20. TETE ONIANGO M.D. PLLC was incorporated on July 21, 2009. Dr. ONIANGO was listed as the registered agent. In the company's most recent corporate filing on record with LARA, a 2016 Annual Report, Dr. ONIANGO is listed as the authorized agent.

21. In May 2014, a confidential source (hereafter CS 1) informed Dearborn Police Department narcotics officers that W.A., who worked at a physical therapy office, was recruiting clients to see a doctor who was working with W.A. CS 1 said that the doctor prescribed controlled substances such as Vicodin (hydrocodone bitartrate), Soma (carisoprodol), Adderall, and other street-desired medications. CS 1 said that W.A. took the patients to the pharmacy, paid for the prescriptions, and paid the patients for their participation and medications. CS 1 said that W.A. then sold the patients' prescription pills at an increased price.

22. In August 2014, CS 1 met W.A. at an office located at Haggerty and Kingsley Roads (known to be 10365 Haggerty Road, Dearborn, Michigan). W.A. had CS 1 fill out some forms and then gave CS 1 $100.00 to pay the doctor.

23. CS 1 met with the doctor in the doctor's office, which was located in a room across from an office used by W.A. The doctor asked about CS 1's pain problems. The doctor took the $100.00 cash from CS 1 for the visit and gave CS 1 prescriptions for controlled substances. The doctor made copies of the prescriptions for his records.

24. W.A. gave CS 1 a business card for a transportation company and directed CS 1 to a particular pharmacy. W.A. also gave CS 1 $120.00 to pay for the prescriptions. Another individual was also transported in the vehicle, but the individual went to a different pharmacy.

25. CS 1 filled the prescriptions for controlled substances and returned to the doctor's office building. CS 1 met W.A. in the parking lot. CS 1 gave W.A. the prescriptions. W.A. dumped the medications into a bag and returned the

bottles to CS 1. W.A. paid CS 1 $100.00 for the prescriptions.

26. CS 1 advised that the name on the prescriptions was Dr. TETE ONIANGO.

27. In September 2014, another confidential source (hereafter CS 2) informed detectives for the Dearborn Police Department that he/she previously worked for W.A. in W.A.'s physical therapy clinic when W.A. asked CS 2 if he/she wanted to make some extra money. CS 2 said that W.A. approached CS 2 and offered him/her $100.00 to see Dr. ONIANGO in order to receive prescriptions for controlled substances.

28. CS 2 said that he/she arrived at Dr. ONIANGO's office and met with W.A. and Dr. ONIANGO's secretary. W.A. had CS 2 complete paperwork and told CS 2 what to say to the doctor. W.A. instructed CS 2 to say that he/she suffered from back pain and had difficulty sleeping. W.A. gave CS 2 $100.00 to give to Dr. ONIANGO as payment for the visit.

29. CS 2 reported that he/she was introduced to the doctor, whose name CS 2 believed to be "Tete." The doctor asked about the purpose of the visit, and CS 2 advised that he/she had back pain and could not sleep. The doctor did not administer any diagnostic tests or perform an exam. Tete prescribed CS 2 90 tablets of Lortab (hydrocodone bitartrate/acetaminophen) and 60 tablets of Xanax (alprazolam). The doctor made copies of the prescriptions for his records. When Tete asked how CS 2 was going to pay, CS 2 produced the $100.00 cash provided by W.A.

30. W.A. then transported CS 2 to a nearby pharmacy. W.A. gave the prescriptions to the pharmacist and also paid for the prescriptions. CS 2 turned the pills over to W.A. W.A. paid CS 2 $90.00 for the visit.

31. CS 2 entered into the same arrangement with W.A. on at least two occasions between July and September 2014. Each time, CS 2 obtained prescriptions from Dr. ONIANGO, was brought to a pharmacy where the prescriptions were filled, and sold the prescribed pills to W.A.

32. In November 2014, detectives with the Dearborn PD conducted a trash cover at a residence known to be used by W.A. A delivery receipt was located in the trash which listed a telephone number known to be associated with W.A. A prescription label in the name of Patient 1, who was not known to be associated with the address, was located. The prescribing doctor on the label

7

was Dr. ONIANGO.

33. In July 2016, Dearborn PD officers conducted a traffic stop of a vehicle. The driver, J.S., consented to a search of the vehicle. During the search, the police officers located a handgun, cash, foil packets of marijuana, baggies containing various pills (Percocet, Adderall, Xanax, oxycodone, Soma, and others), pill bottles, and 21 prescriptions in multiple individuals' names all written by Dr. ONIANGO.

34. J.S. was arrested on felony firearm charges. During an interview Dearborn PD narcotics officers following his arrest, J.S. stated that he sometimes sold pills to support his family. J.S. said that he obtained the pills from his doctor or from people on the street.

35. I have reviewed a report from MAPS for Dr. ONIANGO. The report showed that Dr. ONIANGO wrote J.S. prescriptions for Tramadol (a Schedule IV narcotic), promethazine with codeine (a Schedule V cough syrup), alprazolam, and amphetamine salt every month for 14 months before his July 2016 arrest. Since J.S.'s arrest in July 2016, Dr. ONIANGO has written J.S. prescriptions for the same substances every month through April 2017, with the exception of January 2017.

36. FBI agents interviewed J.S. in December 2016. J.S. told agents that his/her first visit to Dr. ONIANGO's office lasted about one minute, that J.S. only filled out paperwork the first visit, and that Dr. ONIANGO's office was not equipped for routine medical exams. J.S. was prescribed 60 to 120 pills each month by Dr. ONIANGO, all of which were for controlled substances. After knowing Dr. ONIANGO for a while, J.S. was able to request specific prescriptions for controlled substances. Dr. ONIANGO only declined J.S.'s request for a prescription or to increase the quantity of pills on one occasion when J.S. asked for more Adderall. J.S. paid Dr. ONIANGO $100 in cash to receive his prescriptions.

37. During the same interview, J.S. also stated he/she brought relatives or friends with him/her to Dr. ONIANGO's office to get prescriptions. After J.S.'s relatives' and friends' initial visits, Dr. ONIANGO regularly wrote prescriptions for them without them being present and gave the prescriptions to J.S. J.S. gave Dr. ONIANGO $100 for each additional patient's prescription he/she received. J.S. typically received prescriptions for eight individuals and paid Dr. ONIANGO $800 in cash each visit.

8

38. In November 2016, Dearborn Police responded to a disorderly conduct call at a local hotel. They were informed by hotel staff that the occupants of a room had paid for one day, overstayed, and then refused to leave or pay for additional days. The renter of the hotel room, M.A., had active warrants from multiple jurisdictions. The police arrested M.A. on the outstanding warrants. While searching M.A., police located two baggies in his front pocket that contained suspected Xanax, suspected Adderall, and a suspected Suboxone strip. M.A. also had two prescription pill bottles in his pocket. One bottle was empty and the other bottle contained various narcotic pills believed to be Percocet. The empty pill bottle was labeled "Carisoprodol 350mg / Dr. Tete Oniango."

39. Another occupant of the room, U.A., was also arrested on active warrants from other jurisdictions. Police seized a suspected Dilaudid pill and a cellular phone from U.A.

40. The third occupant of the room, S.A., claimed that the pills on M.A.'s person belonged to him. S.A. was arrested for possession with intent to distribute.

41. The hotel requested that the occupants' vehicle be towed from the property. An inventory search was conducted of the vehicle registered to M.A. Inside the vehicle, police located suspected Adderall pills, two empty prescription bottles in M.A.'s name, an empty prescription bottle in another individual's name, a written prescription from Dr. ONIANGO for M.A. dated October 11, 2016, and narcotic packaging.

42. In May 2017, U.A. was interviewed by FBI Agents. U.A. stated that on the day of his arrest at the hotel, M.A. was the main person dealing pills out of the hotel room. M.A. primarily sold "roxys and percs" (slang for Roxicodone and Percocet) and that M.A.'s source for the pills was Dr. ONIANGO. U.A. then said he gave M.A. a ride along with M.A.'s friend, "D." D told U.A. that Dr. ONIANGO would see new patients for $1,000, that Dr. ONIANGO is only open on Tuesdays, and that the office would close after approximately 50 patients had been seen. U.A. further stated that most clients of Dr. ONIANGO obtain pills from Dr. ONIANGO in order to resell them.

43. I have reviewed data from Dr. ONIANGO's MAPS report, which showed that Dr. ONIANGO wrote M.A. prescriptions for controlled substances on

14 different dates from July 2015 through October 2016, including October 11, 2016. Dr. ONIANGO prescribed M.A. a combination of 60 tablets of amphetamine salt, 90 tablets of hydrocodone bitartrate 10mg/acetaminophen 325mg, and 60 tablets of carisoprodol on every occasion, with the exception of two dates in which he did not prescribe the carisoprodol. Since his November 2016 arrest, M.A. received the same combination of prescriptions from Dr. ONIANGO on four occasions from November 2016 through February 2017. MAPS showed that neither U.A. nor S.A. received any prescriptions from Dr. ONIANGO during the time frame of this investigation. My review of MAPS also showed that Dr. ONIANGO typically wrote prescriptions for approximately 40 to 50 patients on Tuesdays from 2015 through 2017, and wrote only a few prescriptions the other days of the week.

44. In July 2015, a third confidential source (hereafter CS 3) advised that he/she was a patient of Dr. ONIANGO. CS 3 stated that W.A. told CS 3 that W.A. could help CS 3 get Vicodin and Xanax. W.A. explained that he would give CS 3 $100.00 to pay the doctor, and the doctor would write prescriptions for 90 tablets of Vicodin and 60 tablets of Xanax. W.A. said that the doctor "knew the deal."

45. CS 3 stated that about one year prior to CS 3 speaking with the FBI, W.A. arranged for CS 3 to see Dr. ONIANGO. W.A. handled the paperwork with the secretary. W.A. also gave CS 3 $100 to pay the doctor. After obtaining the prescriptions from Dr. ONIANGO, W.A. took CS 3 to a pharmacy. W.A. paid for the prescriptions to be filled. CS 3 gave W.A. the prescription for Vicodin and kept the prescription for Xanax. W.A. paid CS 3 between $50 and $70 for the Vicodin.

46. CS 3 said that on a later visit, W.A. did not give CS 3 money to pay the doctor prior to the visit. When the time came to pay Dr. ONIANGO, CS 3 told him that W.A. would pay him the money later.

47. CS 3 said that after one visit, W.A. took CS 3's Xanax pills in addition to the Vicodin. On the next visit, CS 3 complained to Dr. ONIANGO that W.A. had taken his/her Xanax prescription. On the following visit, Dr. ONIANGO told CS 3 that he had talked to W.A. about taking CS 3's Xanax prescription.

48. CS 3 advised that Dr. ONIANGO never asked about pain on the first visit,

and CS 3 could not remember if Dr. ONIANGO asked about pain on subsequent visits. Dr. ONIANGO never gave CS 3 a physical exam, administered any tests, or gave CS 3 any referrals. CS 3 advised that Dr. ONIANGO's office did not have an exam room, and the doctor visits always occurred in Dr. ONIANGO's office. Nonetheless, on each visit, Dr. ONIANGO wrote CS 3 prescriptions for Vicodin and Xanax.

49. In August 2015, CS 3 entered TETE ONIANGO M.D., PLLC, at 10365 Haggerty Road in Dearborn, Michigan, and attempted to see Dr. ONIANGO in order to obtain medically unnecessary prescriptions for controlled substances. CS 3 was equipped with a recording device and I have reviewed this recording.

50. The recording captured CS 3 meeting with Dr. ONIANGO. Dr. ONIANGO spoke briefly with CS 3 about his/her job. During the conversation about CS 3's job, Dr. ONIANGO asked, "Do you want the Norco and Xanax today?" CS 3 responded, "Yes, please, 90 and 60." Dr. ONIANGO then immediately returned to asking questions about CS 3's job.

51. In addition to the recording, CS 3 reported there was a female in the clinic organizing folders. CS 3 also said he/she gave Dr. ONIANGO $100 cash immediately upon entering the office. CS 3 observed Dr. ONIANGO make copies of CS 3's prescriptions and write in CS 3's patient file.

52. There is no indication Dr. ONIANGO conducted a physical exam on CS 3, or that CS 3 had any vital signs taken before seeing Dr. ONIANGO. Dr. ONIANGO never asked about any pain. Dr. ONIANGO never discussed the purpose of any of the medications or any risks associated with the medications. The duration of the visit was less than five minutes.

53. In December 2015, CS 3 again entered TETE ONIANGO M.D., PLLC, and attempted to see Dr. ONIANGO in order to obtain medically unnecessary prescriptions for controlled substances. CS 3 was equipped with a recording device and I have reviewed this recording.

54. The recording showed that CS 3 saw Dr. ONIANGO in his office. Dr. ONIANGO sat at his desk behind a laptop computer for the entire visit. Dr. ONIANGO asked CS 3 about his/her job and CS 3's Thanksgiving holiday. Dr. ONIANGO asked CS 3 what CS 3 needed this time and CHS 3 responded, "The usual." Dr. ONIANGO asked CS 3 if he gave CS 3 Norco

on the last visit. CS 3 replied, "Yes, 90 and 60 Xanax." Dr. ONIANGO asked about CS 3's back. CS 3 replied that his/her back was a little sore, especially at night, which was why CS 3 wanted "vikes" (slang for Vicodin).

55. The recording also showed that Dr. ONIANGO never conducted a physical exam on CS 3. CS 3 did not have any vital signs taken before seeing the doctor. Dr. ONIANGO never discussed the purpose of any of the medications nor any risks associated with the medications. The duration of the visit was less than five minutes. Nonetheless, Dr. ONIANGO provided CS 3 with prescriptions for Xanax and Norco. Dr. ONIANGO also wrote CS 3 prescriptions for several non-controlled medications. CS 3 handed Dr. ONIANGO $100 in cash after receiving the prescriptions.

56. I reviewed data from Dr. ONIANGO's MAPS report for CS 3, which showed that CS 3 received prescriptions from Dr. ONIANGO for controlled substances on multiple occasions over a period of two and a half years. Over 10 visits, CS 3 received prescriptions for 60 tablets of alprazolam 2 mg and 90 tablets of hydrocodone bitartrate 10 mg/acetaminophen 325 mg each time. On two dates, CS 3 received only a single prescription for alprazolam 2 mg.

57. In July 2015, a concerned community member, who worked for a non-profit agency as a community liaison, contacted the FBI about Dr. ONIANGO. The liaison reported that on two occasions, individuals who wished to remain anonymous had talked to the liaison about a "pill doctor" operating in Dearborn. One of the individuals was a patient of Dr. ONIANGO, and the other individual was a close associate of a patient. The individuals reported that Dr. ONIANGO gave out narcotics prescriptions in exchange for $100 cash. Dr. ONIANGO asked patients what drugs they wanted or needed, and then wrote out the prescriptions.

58. One individual provided the community liaison with a document from Dr. ONIANGO's office. That document identified "TETE ONIANGO M.D., 10365 Haggerty, Suite 113, Dearborn, Michigan." The document listed accepted insurances. The document also indicated that patients were subject to random drug tests, that patients requesting Opana, Oxycontin, Percocet, and Phenergan with Codeine cough syrup would not be seen, and that patients exhibiting unprofessional behavior will be discharged.

59. In November 2016, federal agents interviewed a cooperating witness

(hereafter CW 1). CW 1 knew who W.A. was and that W.A. connected people who wanted pain medication to the doctor. W.A. directed CW 1 to Dr. ONIANGO. CW 1 reported that W.A. coached prospective patients to say that they are in pain in order for the patient to get the pain medications they wanted. CW 1 said that he/she first visited Dr. ONIANGO in February 2015. CW 1 stated that he/she then had a superficial hand injury. CW 1 said that during the visit, Dr. ONIANGO sat behind his office desk and did not examine CW 1 or the injured hand. CW 1 estimated that Dr. ONIANGO spent less than five minutes with CW 1. CW 1 paid Dr. ONIANGO $100 and was provided with the prescriptions CW wanted. CW 1 advised that he/she continued to see Dr. ONIANGO. On each visit, Dr. ONIANGO wrote CW 1 prescriptions for controlled substances in exchange for $100. On occasion, CW 1 asked Dr. ONIANGO for a higher pill count or an additional prescription. When CW 1 received a higher pill count or a third controlled substance prescription, Dr. ONIANGO told CW 1 to pay him an extra $50.

60. I reviewed data from Dr. ONIANGO's MAPS report for CW 1, which showed that CW 1 received prescriptions from Dr. ONIANGO for controlled substances on five occasions from February through July 2015.

    a. On the first visit, CW 1 received prescriptions from Dr. ONIANGO for 90 tablets of hydrocodone bitartrate 10 mg/acetaminophen 325 mg and 90 tablets of carisoprodol.

    b. On the second visit, CW 1 received prescriptions from Dr. ONIANGO for 30 tablets of amphetamine salt, 120 tablets of hydrocodone bitartrate 10 mg/acetaminophen 325 mg, and 90 tablets of carisoprodol.

    c. On the third visit, CW 1 received prescriptions from Dr. ONIANGO for 60 tablets of amphetamine salt, 120 tablets of hydrocodone bitartrate 10 mg/acetaminophen, and 60 tablets of carisoprodol.

    d. On the fourth visit, CW 1 received a prescription from Dr. ONIANGO for 60 tablets of amphetamine salt.

    e. On the fifth visit, CW 1 received prescriptions from Dr. ONIANGO for 60 tablets of amphetamine salt, 120 tablets of hydrocodone bitartrate 10 mg/acetaminophen, and 60 tablets of carisoprodol.

61. On October 10, 2016, Dr. ONIANGO's attorney contacted DEA to report that Dr. ONIANGO's DEA number had been compromised. In response, DEA agents interviewed Dr. ONIANGO on November 7, 2016. During the interview, Dr. ONIANGO stated a pharmacy contacted him to report it had received fraudulent prescriptions with his DEA number on them. Dr. ONIANGO also stated that he only saw patients in his Dearborn clinic for six hours on Tuesdays. Dr. ONIANGO estimated that he saw 15 to 35 patients per day and prescribed controlled substances to approximately 50% of his patients. Dr. ONIANGO claimed that he did not see any patients at the other business.

62. I reviewed Dr. ONIANGO's MAPS data from January 2014 through April 2017, which shows he typically wrote prescriptions for 40 to 50 different patients on Tuesdays throughout 2016 and 2017, and also wrote prescriptions most other days of the week as well. On the days Dr. ONIANGO prescribed controlled substances from January 1, 2014 through April 30, 2017, he wrote an average of 20.5 prescriptions per day. Dr. ONIANGO has written 100 or more controlled substance prescriptions on 25 different dates from January 2014 through April 2017, with the most being 148 on December 15, 2015. As recently as April 18, 2017, Dr. ONIANGO wrote 100 controlled substance prescriptions for 50 unique patients. Dr. ONIANGO's downplaying of the number of patients he typically sees and the number of prescriptions he writes indicates knowledge that he is prescribing controlled substances without medical necessity.

63. I analyzed the MAPS data available on Dr. ONIANGO for the period of January 1, 2014 through April 30, 2017 and noted the following:

    f. Hydrocodone bitartrate: Pharmacies in the U.S. filled at least 8,856 prescriptions for 792,854 tablets of hydrocodone bitartrate prescribed by Dr. ONIANGO. Of these 792,854 tablets, 95% were for the strongest dosage of hydrocodone (10 mg), and 4.5% were for the second strongest dosage (7.5 mg). These are the most commonly diverted dosage units. Hydrocodone bitartrate is available in 5mg, 7.5mg, and 10mg dosage units.

    g. Pharmacies filled prescriptions for controlled substances prescribed by Dr. ONIANGO for 1,324 unique individuals. Of those 1,324 unique individuals, 1085 (82%) received prescriptions from Dr. ONIANGO for hydrocodone bitartrate.

14

    h. Alprazolam: Pharmacies in the U.S. filled at least 3,849 prescriptions for 214,930 tablets of alprazolam prescribed by Dr. ONIANGO. Of these 214,930 tablets, 52% were the strongest dosage (2 mg), and 42% were the second strongest dosage (1 mg). These are the most commonly diverted dosage units. Alprazolam is also available in 0.25mg and 0.5mg doses.

    i. Of the 1,324 unique individuals for whom Dr. ONIANGO wrote prescriptions, 383 (29%) received prescriptions from Dr. ONIANGO for alprazolam.

    j. Carisoprodol: Pharmacies in Michigan filled at least 3,077 prescriptions for 198,758 tablets of carisoprodol prescribed by Dr. ONIANGO. Carisoprodol is only available in 350mg doses.

    k. Of the 1,324 unique individuals for whom Dr. ONIANGO wrote prescriptions, 497 (38%) received prescriptions from Dr. ONIANGO for carisoprodol.

64. Further review of MAPS data revealed several suspect prescribing patterns:

    l. Dr. ONIANGO prescribed a combination of hydrocodone bitartrate/acetaminophen and alprazolam to 33% of his patients.

    m. Dr. ONIANGO prescribed hydrocodone bitartrate/acetaminophen and carisoprodol to 35% of his patients.

    n. At least 40 patients who received prescriptions from Dr. ONIANGO from January 1, 2014 through April 30, 2017 resided outside of the Detroit metropolitan area, including cities within Michigan (e.g., Grand Rapids, East Lansing, Ann Arbor, Jackson, Howell), and states such as Georgia, Indianapolis, Ohio, Nebraska, and California.

    o. An unusually high percentage of patients received the highest available dosage of narcotics.

    p. Between January 1, 2014 and November 15, 2016, even though Dr. ONIANGO prescribed frequently abused controlled substances to a high percentage of his patients, he requested only 104 MAPS reports

for 77 unique patients. Based on my experience, a doctor who is legitimately prescribing controlled substances checks the MAPS report for a far higher percentage of the patients who receive those substances.

65. I believe that these data from Dr. ONIANGO's MAPS report indicate a doctor engaged in the diversion of controlled narcotics.

66. Based upon the quantities of filled controlled substances prescribed by Dr. ONIANGO between the dates January 1, 2014, and April 30, 2017, and the estimated street value of the most commonly diverted of those controlled substances, I estimate that the street values of these controlled substances are as follows: (It should be noted these estimated street prices are not necessarily indicative of street prices in Metro Detroit, but of prices which can be obtained in geographical locations to where controlled prescription substances are often diverted from the Metro Detroit area.)

q. Hydrocodone bitartrate /acetaminophen: A total of 36,215 tablets of 7.5mg hydrocodone bitartrate /acetaminophen, at an estimated $5 per tablet, results in an approximate street value of $181,075. A total of 754,017 tablets of 10mg hydrocodone bitartrate /acetaminophen, at an estimated $6.00 per tablet, results in an approximate street value of $4,524,102.

r. Alprazolam: Alprazolam is sold for about $2 per milligram. Dr. ONIANGO prescribed 90,435 1mg tablets and 114,469 2mg tablets. That yields a total of 319,393mg of alprazolam with a total estimated street value of approximately $638,736.

s. Carisoprodol: A total of 198,758 350mg tablets, at an estimated $2.00 per tablet, results in an estimated street value of $397,516.

t. In sum, the estimated street value of the most commonly diverted controlled prescription substances prescribed by Dr. ONIANGO between January 1, 2014 and April 30, 2017 and eventually filled is about $5,741,429.

67. Based on the number of patients Dr. ONIANGO sees in one day, the number and type of prescriptions he writes, the brevity of the office visits, lack of physical examinations, and reporting from numerous sources that Dr.

16

ONIANGO deals with a patient recruiter and accepts cash payments, I believe that Dr. ONIANGO has demonstrated on numerous occasions, as indicated within this affidavit, his knowledge that the controlled substances he prescribed were not medically necessary and were therefore likely being diverted.

68. Based on surveillance and confidential source reporting, I have confirmed that TETE ONIANGO M.C. PLLC, and Dr. ONIANGO, are currently operating at 10365 Haggerty, Suite 113, Dearborn, Michigan. Several federal agents have conducted surveillance at 10365 Haggerty and have seen Dr. ONIANGO arrive and depart.

69. Interviews of current and former patients confirmed that Dr. ONIANGO maintains a private office and files inside the clinic. In my experience, business records are normally maintained in offices. Business records usually consist of financial records, correspondence, employee files, invoices, checks, bills, as well as records indicating ownership and control. Patient records are normally maintained in an area in close proximity to where the services are provided, so office staff can have access to those records for future appointments, referrals, and billing purposes. Patient records usually consist of prognosis reports, treatment notes, appointment logs, patient sign-in logs, billing records, and other miscellaneous types of communication.

70. It has been my experience and training that as a general rule, offices and healthcare providers rely upon computers for the creation and storage of data, including billing data and other financial and business records. It is likely that the provider's insurance billing and patient records, documents and materials will be found stored on computers at the offices of Dr. ONIANGO. A medical provider typically maintains these types of records in order to provide support for patient medications and billing transactions if later questioned by insurers, vendors, the Internal Revenue Service, and federal or state regulatory agencies. Furthermore, medical doctors and chiropractors are required to retain many of these records pursuant to state or federal law. For example, according to Michigan Department of Community Health's website, "In general, medical records with respect to competent adults should be kept at least seven (7) years."

71. It has also been my experience and training that as a general rule, owners and operators of offices, as well as conspirators in schemes to distribute

controlled substances, rely upon cellular, or mobile, telephones in order to communicate via telephone, text messaging and email. This data is often crucial in identifying other co-conspirators. It is likely that the cellular, or mobile, telephones of Dr. ONIANGO will be found on his person or in his office.

## CONCLUSION

Based on the foregoing, I believe there is probable cause that the business address of TETE ONIANGO M.D. PLLC, located at 10365 Haggerty, Suite 113, Dearborn, Michigan, will contain the items set forth in Attachment B, which constitute evidence, contraband, and/or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846. As such, I respectfully request that a search warrant be issued for that address, which is more particularly described in Attachment A.

## REQUEST FOR SEALING

I request that this Court issue an order sealing all papers submitted in support of this application, including the application, affidavit, and search warrant until: (a) the fact and particulars of the affidavit must be disclosed, pursuant to the government's legal obligations, to counsel for individuals who may be arrested in the future; or (b) the government represents that the items covered by this motion can be made public without substantial risk to the safety of defendant or others. I believe that sealing these documents in this fashion is necessary because the items and information to be seized are relevant to an ongoing investigation of a criminal conspiracy and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, e.g., by posting them publicly online through "carding" forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Special Agent MICHAEL WAKELEY
Federal Bureau of Investigations

18

Sworn to before me and signed in my
presence and/or by reliable electronic means.

_____
HON. DAVID R. GRAND
United States Magistrate Judge


DATED:    June 5, 2017

## ATTACHMENT A:

### <u>PREMISES TO BE SEARCHED</u>

The premises to be searched is the business address of Tete Oniango M.D.
PLLC, 10365 Haggerty, Suite 113, Dearborn, Michigan. This office is located
inside a red brick multi-story office building located at the corner of Haggerty
Road and Kingsley Street. The door on the east side of the building is marked with
a small sign for Tete Oniango. The office is located in Suite 113, located on the
first floor of the building. The door to Suite 113 is marked with a sign for Tete
Oniango Center for Preventive Medicine.



**ATTACHMENT B:**

**ITEMS TO BE SEIZED**

From the period of January 1, 2014, until the present, any and all of the following items concerning or related to any individual or entity, known or unknown, who is reasonably believed to be part of the scheme or a beneficiary of the scheme including but not limited to:

> **Individuals:** Tete Oniango, Walleed Al-Biraihy
> **Entities:** Tete Oniango, MD PLLC

This information may be stored or filed and includes any format in which the information may exist, including but not limited to the media of hard copy, computer hard disks, digital storage devices, and or computer disks:

1. Electronic storage media, including, but not limited to: Any magnetic, electronic or optical storage device capable of storing data, such as computers, servers, floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, cellular telephones;

2. All records related in any way to all patients of the above persons or businesses, including, without limitation, the following type of records: patient charts, files, records, treatment cards, prescription records, patient ledger cards, patient complaints, patient sign-in sheets, physician notes, nursing notes, medical assistant notes, original patient or referral source listing;

3. All documents constituting, concerning, or relating to bills, invoices, and claims for payment or reimbursement for services billed to insurance companies for any patients;

4. All financial statements, records, and documents, including without limitation:

a. Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond funds; including deposit and reimbursements, cancelled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

b. Credit/Automatic Teller Machine/Debit card accounts;

c. All corporate, business, and personal tax returns, including without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

d. All financial statements and credit reports;

e. All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications, financing agreements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds

f. All accounts payable and receivable records

5. All documents consisting, concerning, or relating to all current and former employees, including, without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements, and W-2 forms;

6. All documents constituting, concerning, or relating to work and personal diaries, calendars, logs, appointment books, and schedules;

7. All documents related to the purchase, leasing, servicing, or operation of any durable medical, physical therapy, laboratory or other medical equipment;

8. All records related to any payments made to patients or recruiters to induce patients to seek treatment from any of the above referenced individuals or businesses;

9. All invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or businesses;

10. All contracts, billing agreements, professional services agreements, or any other contracts between the above referenced individuals or businesses and any other individual, company, physician, or billing company;

11. Instructions, memoranda, passwords, and other information relating to, or required to facilitate the operation of any computer equipment, which contains any of the aforesaid information.

12. Records of control over other areas such as storage units where financial, medical, or other billing records may be maintained;

13. Records of control of the premises and things described, namely, utility bills, telephone bills, rent or lease records pertaining to or evidencing ownership or control of the premises to be searched;

14. All retrievable information such as recorded telephone messages, and other electronically stored information and computer hardware, including, without limitation, floppy discs, compact discs or other data storage discs or tapes, thumb or flash drives. Any electronic storage media, including, without limitation, cellular telephones, pagers, electronic organizers, tablet computers, and PDAs, may be held for such reasonable time as necessary to determine whether it contains data within the scope of this warrant. Where data is found a personal computer storage drive file, the agents executing this warrant are authorized to seize, where necessary, the computer's input/output or "I/O" devices, software, documentation, and data security devices. When the computer analyst determines that these items are no longer necessary to retrieve and preserve that data evidence, they will be returned within a reasonable time;

15. Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including, without limitation, articles of incorporation, by-laws, and annual reports;

16. All correspondence, including memoranda, letters, and electronic mailings (email) concerning any of the records described in the previous paragraphs;

17. Currency or other items of significant value reasonably believed to be the proceeds of the illegal activity described in the affidavit for this search warrant;

18. Records related to assets or items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.;

19. The terms "records," "documents," "communications," and "applications," includes all of the foregoing items of evidence in whatever form and by whatever means such records, documents, communications, applications, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing or drawing with any implement, on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, photocopies); any mechanical form (such as printing or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard drives, backup tapes, CD ROMs, optical discs, printer puffers, smart cards, memory calculators, or electronic notebooks, as well as printouts and readouts from any magnetic storage device.

| | AUSA: | John Engstrom | Telephone: (313) 226-9571 |
|---|---|---|---|
| AO 93 (Rev. 11/13) Search and Seizure Warrant | Special Agent: | Michael Wakeley | Telephone: (313) 965-6358 |

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case: 2:17-mc-50785 |
| 10365 HAGGERTY, SUITE 113 | ) | Assigned To : Cox, Sean F. |
| DEARBORN, MI 48126 | ) | Assign. Date : 6/5/2017 |
| | ) | Description: RE: SEALED MATTER (EOB) |

Case No.

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Michigan_____.
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before    June 18, 2017    *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty        .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for      days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of        .

Date and time issued:  June 5, 2017    3:34 pm

_____
*Judge's signature*

City and state:   Detroit, Michigan

Hon. David R. Grand,      U. S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

*Printed name and title*